[L. A. No. 8186. In Bank.—July 1, 1926.]

'JOHN E. JARDINE, Respondent, v. CITY OF PASA-DENA (a Municipal Corporation) et al., Appellants.

PASADENA ORANGE GROWERS ASSOCIATION (a Corporation), Respondent, v. CITY OF PASADENA (a Municipal Corporation) et al., Appellants.

MORRIS COHN et al., Respondents, v. CITY OF PASA-DENA (a Municipal Corporation) et al., Appellants.

E. FLEUR et al., Respondents, v. CITY OF PASADENA (a Municipal Corporation) et al., Appellants.

[1] MUNICIPAL CORPORATIONS—POLICE POWER—MAINTENANCE OF ISO-LATION HOSPITAL—PRIVATE RIGHTS.—The establishment and main-tenance by a city of an isolation hospital is an exercise of the police power of the city and in this respect the police power of the city is as broad as that possessed by the legislature, sub-ject only to the control of general laws; and the mere fact that private rights are involved cannot make these rights the controlling factor in a controversy between public benefit and private rights.

[2] ID.—PASADENA—SELECTION OF HOSPITAL SITE—LEGISLATIVE DIS-CRETION—INJUNCTION.—The selection of an isolation hospital site was a matter within the legislative discretion of the board of directors of the city of Pasadena, and unless in the exercise of that discretion the board acted arbitrarily and unreasonably, its action ought not to be enjoined.

---

1. Power to establish and maintain hospitals, note, 25 A. L. R. 612. See, also, 13 Cal. Jur. 764; 18 Cal. Jur. 815; 19 R. C. L. 716.

2. See 18 Cal. Jur. 834; 13 R. C. L. 955.

[3] ID.—PROTECTION OF HEALTH—POLICE POWER.—General police authority to protect the public health is conferred upon the city of Pasadena by section 11 of article XI of the state constitution; and under the charter of said city it is given power "to erect, construct, and maintain . . . hospitals" (subd 6, sec. 3, art. I, Stats. 1901, p. 888) and "to make and enforce all such local, police, sanitary and other regulations as are deemed expedient to maintain the public peace, protect property, promote the public morals, and preserve the health of the inhabitants of the city" (subd. 20, sec. 3, art. I, Stats. 1901, p. 890).

[4] ID.—MUNICIPAL POWERS—LEGISLATIVE FUNCTIONS.—Under section 10 of article VIII of the charter of the city of Pasadena (Stats. 1901, p. 904), the function of carrying into effect the power of said city to erect, construct and maintain hospitals and to make and enforce all such local, police, sanitary, and other regulations as are deemed expedient to maintain the public peace, protect property, promote the public morals, and preserve the health of the inhabitants of the city, is conferred upon the legislative body of the city; and the legislative body of said city in adopting an ordinance fixing the location of an isolation hospital was exercising its legislative function.

[5] ID. — VALIDITY OF LEGISLATIVE ACTION — PRESUMPTIONS — DISCRETION.—Every intendment is to be indulged in and all doubts resolved in favor of the validity of the action of the legislative body of a city; and the legislative determination of the facts which warrant the action of the legislative body will not be set aside or disregarded by the court unless the legislative discretion is clearly and palpably wrong and such appears to be and is found to be the fact from the evidence educed before the trial court.

[6] ID.—ADAPTATION OF HOSPITAL SITE—DANGER OF INFECTION—EVIDENCE—LEGISLATIVE FINDINGS.—In these consolidated actions to enjoin the city of Pasadena from constructing and maintaining an isolation hospital upon a block of land owned by and situated in said city, there was ample evidence to sustain the express finding of the legislative body of said city, as set forth in the ordinance fixing and establishing said site, that the property in controversy was located in an area adapted to use as a site for an isolation hospital, and such evidence also sustained the finding, necessarily implied from the very fact of enactment of the ordinance, that the health of the persons living in the immediate vicinity would not be endangered by the proper maintenance of the isolation hospital in the particular locality in question and

---

3. See 18 **Cal. Jur.** 819.

5. Presumptions in favor of ordinance, note, Ann. **Cas.** 1916B, 502. See, also, 18 Cal. Jur. 931; 19 R. C. L. 808.

that there was no danger of infection of the underground water supply from the presence of the hospital and the system of sewerage employed therewith.

[7] ID.—HOSPITAL FOR CONTAGIOUS DISEASES—NUISANCE PER SE.— A hospital constructed and maintained for the treatment of contagious and infectious diseases is not per se a nuisance.

[8] ID.—ABSENCE OF ACTUAL DANGER — FEAR — DEPRECIATION OF PROPERTY VALUES.—Where there is no actual danger of infection due to the presence of an isolation hospital in a given locality, the fact that fear of such danger tends to depreciate the value of surrounding property for residential purposes will not suffice to warrant the issuance of an injunction to restrain the erection and maintenance of such hospital.

[9] ID.—DANGER FROM INFECTION—SPECULATIVE EVIDENCE—FINDINGS. In an action to enjoin a city from constructing and maintaining an isolation hospital in a given locality within the city, testimony of medical experts that in their opinion there will be danger of the spread of contagious and infectious diseases to residents in the neighborhood thereof such as the danger of infection from insects such as flies, fleas, or mosquitos, or from animals such as rats or other rodents, cats, dogs or birds, or from children or feeble-minded people wandering into the hospital or into dangerous proximity thereto, or from escaping patients, or from possible infection of the clothing of nurses, attendants, or from unknown carriers of disease, is entirely speculative and will not support a finding to the effect that the maintenance and operation of the hospital will constitute a nuisance.

[10] ID.—SPREAD OF INFECTION — DANGER TO PUBLIC AT LARGE — ABSENCE OF SPECIAL ELEMENTS OF INJURY—PRIVATE NUISANCE.—The possible spread of infection through insects, animals, heedless persons, or the infected clothing of nurses and others engaged in the operation of an isolation hospital when coming into contact with the outside world, even if a cogent reason for the conclusion that such a hospital is a nuisance, has no greater significance in its application to those residing in the vicinity of the hospital than to the public at large and hence such reason will not suffice to constitute such special elements of injury as would serve to create a private nuisance for which property owners in the immediate vicinity of such hospital would be entitled to an injunction to restrain its construction and maintenance.

[11] ID.—AMENDMENT OF ZONING ORDINANCE—LOCATION OF HOSPITAL —INJUNCTION.—A municipality has the right to amend its zoning ordinance from time to time as new and changing conditions warrant and require such revision; and where a city ordinance

---

7. See 13 Cal. Jur. 766; 20 Cal. Jur. 297; 13 R. C. L. 954.
11. See 18 Cal. Jur. 929.

fixing the location of an isolation hospital by express terms repeals all ordinances and parts of ordinances inconsistent therewith, a provision in a prior zoning ordinance prohibiting the erection of hospitals in the locality in question is repealed, and the erection of the hospital cannot be enjoined upon the ground that it is in violation of the zoning ordinance.

[12] ID. — PURCHASE OF LAND WITH WATERWORKS FUNDS — USE AS HOSPITAL SITE — INJUNCTION. — The fact that the property upon which the city proposes to construct and maintain an isolation hospital was purchased with part of the proceeds of a bond issue voted for the purpose of acquiring and constructing a waterworks and system to supply water to said city and its inhabitants does not give to taxpayers the right to restrain the city from using the property in question for any purpose other than water development, where the electors were not called upon to authorize the purchase of any particular property, but in general terms authorized the incurring of the indebtedness for the purpose of acquiring and constructing a waterworks and system, and the bonds were sold and the proceeds used to acquire the properties of a private water company, including the property in question, which the board of directors of the city transferred to the health department as a hospital site, at the same time transferring from the general fund of the city to the waterworks bond fund the amount of the market value of the land transferred to the health department.

---

(1) 30 C. J., p. 463, n. 17; 28 Cyc., p. 727, n. 46.    (2) 28 Cyc., p. 282, n. 98, p. 710, n. 3.    (3) 28 Cyc., p. 709, n. 89.    (4) 28 Cyc., p. 727, n. 46.    (5) 12 C. J., p. 791, n. 19, p. 795, n. 31.    (6) 28 Cyc., p. 347, n. 14.    (7) 28 Cyc., p. 1294, n. 45; 29 Cyc., p. 1175, n. 27. (8) 28 Cyc., p. 1294, n. 45; 29 Cyc., p. 1224, n. 54.    (9) 29 Cyc., p. 1247, n. 48 New.    (10) 29 Cyc., p. 1247, n. 48.    (11) 28 Cyc., p. 737, n. 52 New.    (12) 28 Cyc., p. 1744, n. 29.

APPEAL from a judgment of the Superior Court of Los Angeles County. Paul Burks, Judge. Reversed.

The facts are stated in the opinion of the court.

James H. Howard and R. R. Hess for Appellants.

Gibson, Dunn & Crutcher, O'Melveny, Millikin, Tuller & MacNeil, Walter K. Tuller and Norman S. Sterry for Respondents.

LENNON, J.—A rehearing was granted in this case in response to a petition in which it was strenuously urged by

respondents that the action of a legislative body was conclusive only with reference to *public* rights, and that when a question of *private* rights was involved jurisdiction was vested in the trial court in the first instance to determine whether private rights had been invaded, and the finding of the trial court, if supported by evidence, was controlling upon the appellate court.

Two fundamental questions were involved in the present controversy: (1) Did the establishment of the isolation hospital constitute a private nuisance with reference to respondents and (2) was the action of the legislative body in fixing and establishing a certain block of land as a suitable site for the construction and maintenance of an isolation hospital clearly and palpably arbitrary and unreasonable?

In the former opinion this court held in effect that if the appellate court upon a review of the record found evidence which warranted a finding that the action of the legislative body was not arbitrary and unreasonable, the action of the legislative body must be upheld.

Respondents, however, insist that the objection that the isolation hospital constituted a private nuisance raised a question of *private* rights; that private rights could only be determined by a judicial tribunal; and that the finding of the trial court relative to those private rights, if supported by the evidence, is determinative of the entire controversy. Respondents in this behalf also invoke the aid of the fourteenth amendment. In short, it is respondents' contention that the private rights of the individuals involved are paramount and controlling in the instant case.

With this contention we cannot agree.

[1] It must be conceded that the establishment and maintenance of the isolation hospital was an exercise of the police power of the city. And in this respect the police power of the city is as broad as that possessed by the legislature itself, subject only to the control of general laws. (*Odd Fellows' Cem. Assn.* v. *San Francisco,* 140 Cal. 226, 230 [73 Pac. 987].) Almost invariably in cases of the exercise of the police power both public and private rights are involved. And it is almost inevitable, since the very foundation of the police power is the control of private interests for the public welfare, that the public rights will come into conflict with private rights. As public rights are enlarged, private rights

are diminished; as private rights are enlarged, public rights are diminished. The mere fact, therefore, that private rights are involved cannot make these rights the controlling factor in the controversy between public benefit and private rights. If private rights were the controlling factor the result would be that almost every attempted exercise of the police power would be rendered nugatory by the fact that private rights had been interfered with. For instance, the exercise of the police power as exemplified by zoning ordinances sometimes depreciates the value of private property, not only in a monetary sense but in the sense that it deprives the owner of his freedom to use his property as he sees fit. Yet it cannot be said that in a case involving the validity of a zoning ordinance the question of private rights is controlling. In that case the determinative factor is whether or not the regulations prescribed by the zoning ordinance are or are not reasonable and for the promotion of the general welfare.

It is, of course, unnecessary to say that the cases cited from other jurisdictions are of value only by reason of their persuasive force, and need not, therefore, be distinguished and discussed. The case of *Bloom* v. *City and County of San Francisco*, 64 Cal. 503 [3 Pac. 129], involved the defective and improper sewerage of a city and county hospital. The decision that the city and county of San Francisco was liable for damages has, of course, no application to the instant case, where the nuisance complained of is not the improper conduct of the isolation hospital, but its establishment and maintenance at all on the site chosen. The cases of *Sullivan* v. *Royer*, 72 Cal. 248 [1 Am. St. Rep. 51, 13 Pac. 655], and *Strong* v. *Sullivan*, 180 Cal. 331 [4 A. L. R. 343, 181 Pac. 59], involved the effect of a grant by the city of a permission to an individual to do a certain act or to carry on a certain business. In these cases it was properly held that the permission by the city did not carry with it the authorization to the individual to commit a nuisance. Of course, rules applicable to public grants of privileges to private parties can have no pertinency to a case where the government itself seeks by appropriate means to accomplish for the public benefit any of the objects confided to its jurisdiction. (2 Wood on Nuisances, 3d ed., p. 1097.) The case of *Fisher* v. *Zumwalt*, 128 Cal. 493 [61 Pac. 82], involved the distinction between a public and a private nuisance, as

did also the case of *Lind* v. *City of San Luis Obispo,* 109 Cal. 340 [42 Pac. 437]. In the case of *People* v. *City of Reedley,* 66 Cal. App. 409 [226 Pac. 408], the appellate court found that there was sufficient evidence to sustain the finding of the trial court that there was no nuisance, and hence anything which was said relative to the power of the state board of health to authorize a nuisance was not essential to the decision. Moreover, the discussion does not have any relevancy to the exercise of the police power of a municipality. It concerns itself with the effect of a certificate by a state board of health, and held that the securing of a permit by the city to dispose of its sewage in a certain way was merely the fulfilling of a prerequisite prescribed by the board of health, and that the granting of the certificate did not grant immunity to the city if in fact that method of disposal constituted a nuisance. In short, the requirement of a certificate from the state board of health was in effect a regulation of the conduct of the city for the better health protection of the citizens of the state, and it was held, and properly so, that it was such a regulation and was not intended as an authorization for conduct which, despite the regulation, would be harmful to others. It is apparent from a reading of the decision that the question of sanitation involved was already covered by state regulations, and no question of the right of the city under its police power was raised or decided. Indeed, in none of the cases cited by respondents was the question of the police power of the city raised or discussed. They are all, therefore, distinguishable from the instant case upon that one fact alone.

We are satisfied in the main with the opinion as originally rendered, which, with certain amendments, reads as follows:

"These are appeals from separate judgments rendered and entered in four separate and distinct actions. The several actions were, for the purposes of trial, consolidated by stipulation of the parties and the appeals come to this court upon a single record. The facts are substantially the same in each of the four cases. The City of Pasadena, by Ordinance No. 2176, fixed and established a certain block of land owned by and situate in said City as a suitable site for the construction and maintenance of an isolation hospital under the direction of the health department of said City. The several suits were instituted by the several plaintiffs, who were the

owners of property adjacent to the block selected as the site` for and upon which the isolation hospital was being erected, to enjoin the construction and maintenance of said hospital.

"The grounds upon which the plaintiffs sought an injunction are these: (1) The location and maintenance of the isolation hospital in the particular place selected by the City constitutes a nuisance by reason of the fact that (a) it endangers the health, comfort and well-being of the plaintiffs and their families and damages their property and (b) there is a danger of infection to the underground water supply of the property owners in the vicinity of the hospital by reason of the presence of the hospital and the system of sewage proposed to be used in connection therewith; (2) the City is estopped to maintain an isolation hospital in a district designated by a zoning ordinance of the City as a residence district, which ordinance expressly prohibits the erection of hospitals or sanitariums within such residence district which embraces the site of the isolation hospital; and (3) the property having been purchased with part of the proceeds of a bond issue voted for the purpose of acquiring and maintaining a ` water works system cannot be used as the site of an isolation hospital by the City nor for any purpose other than that for which it was originally acquired.

"Judgments were entered in favor of the plaintiffs declaring the maintenance of said isolation hospital to be a nuisance and permanently enjoining the defendants from maintaining ` or using the building erected upon the site in question as an isolation hospital. From those judgments the defendants appeal."

[2] The selection of the hospital site was a matter within the legislative discretion of the board of directors of the city, and unless in the exercise of that discretion the board acted arbitrarily and unreasonably, its action ought not to be enjoined.

"The location, establishment and maintenance of such an institution is clearly within the scope of the police power of the City. [3] General police authority to protect the public health is conferred upon the City by section 11 of article XI of the state Constitution, which provides that 'any county, city, town, or township may make and enforce within its limits all such local, police, sanitary and other regulations as are not in conflict with general laws.' In addition, the

charter of the City of Pasadena contains the following provision, 'the said city . . . shall have power . . . to erect, construct, and maintain . . . hospitals.' (Subd. 6, sec. 3, article I of the charter, Stats. 1901, p. 888.) The City is also given charter powers 'to make and enforce all such local, police, sanitary and other regulations as are deemed expedient to maintain the public peace, protect property, promote the public morals, and preserve the health of the inhabitants of the city.' (Subd. 20, sec. 3, article I of the charter, Stats. 1901, p. 890.)

[4] "The function of carrying this municipal power into effect is conferred upon the legislative body of the city. Thus the legislative body is vested with authority 'to make and pass all ordinances, resolutions and orders not repugnant to the Constitution of the United States, or of the State of California, or to the provisions of this charter, necessary for the municipal government and management of the affairs of the city, for the execution of the powers vested in the city and for carrying into effect the provisions of this charter.' (Sec. 10, art. VIII of the charter, Stats. 1901, p. 904.) It is also given authority 'to pass ordinances upon any other subject of municipal control, or to carry into force or effect any other powers of the municipality.' (Sec. 10, art. VIII of the charter, Stats. 1901, p. 904.)

"The legislative body of the City of Pasadena in adopting the ordinance fixing the location of the isolation hospital was exercising its legislative function. (*Hopping* v. *Council of the City of Richmond,* 170 Cal. 605 [150 Pac. 977]; *Nickerson* v. *San Bernardino,* 179 Cal. 518 [177 Pac. 465]; *Hill* v. *Board of Supervisors,* 176 Cal. 84 [167 Pac. 514].)

[5] "Every intendment is to be indulged in and all doubts resolved in favor of the validity of its action." The legislative determination of the facts which warrant the action of the legislative body will not be set aside or disregarded by the court unless the legislative discretion is clearly and palpably wrong and such appears to be and is found to be the fact from the evidence educed before the trial court. (*In re Miller,* 162 Cal. 687 [124 Pac. 427]; *Stockton etc. Co.* v. *Stockton,* 41 Cal. 147; *Ex parte Tuttle,* 91 Cal. 589 [27 Pac. 933]; *In re Spencer,* 149 Cal. 396 [117 Am. St. Rep. 137, 9 Ann. Cas. 1105, 86 Pac. 896]; *In re King,* 157 Cal. 161 [106 Pac. 578].)

[6] "There is in the record before us ample evidence to sustain the express finding of the legislative body as set forth in the ordinance that the property in controversy is located in an area adapted to use as a site of an isolation hospital. And such evidence also sustains the finding, necessarily implied from the very fact of the enactment of the ordinance, that the health of the persons living in the immediate vicinity will not be endangered by the proper maintenance of the isolation hospital in the particular locality in question and that there is no danger of infection of the underground water supply from the presence of the hospital and the system of sewage employed therewith. The evidence shows that the hospital is located in a sparsely settled section of the City upon a tract of land containing 6.225 acres entirely owned by the City in fee and entirely surrounded by public highways. A substantial fence has been placed about the building. There is no dispute but that the hospital is being constructed in accordance with the best and most modern conception of the practical application of sanitary science and fully and efficiently equipped for the proper conduct of a modern hospital. There is in the evidence the testimony of medical experts to the effect that any possible danger of contagion arising from the presence of an isolation hospital in a neighborhood may be entirely neutralized and effectively overcome by the application of modern preventive medical measures. Thus while the evidence shows that certain dangers exist, it also shows, without conflict, that means have been devised to meet and overcome them.

"That the possibility of the danger of contagion has been overcome by modern preventive medical measures is demonstrated by the well known fact that isolation wards are commonly maintained in hospitals, surrounded by large numbers of people, patients, visitors and nurses. [7] A hospital constructed and maintained for the treatment of contagious and infectious diseases is not *per se* a nuisance. (*Board of Health* v. *Inhabitants of City of Trenton* (N. J. Ch.), 63 Atl. 897.) In *San Diego Tuberculosis Assn.* v. *East San Diego*, 186 Cal. 252 [17 A. L. R. 513, 200 Pac. 393], this court, disposing of the contention that a hospital, no matter how well conducted, is a menace to the public peace, morals, health and comfort, said: 'A well conducted, modern hospital,

even one for the treatment of contagious and infectious diseases, is not such a menace, but on the contrary one of the most beneficent institutions. . . . There is not the slightest danger of the spread of disease from it, and this is the only possible ground upon which objection could be made to it.'

"The determination of the legislative body necessarily implied in the enactment of the ordinance that there was no danger of an infection of the water supply of the neighborhood is likewise supported by evidence in the record before us. It is true that the evidence shows that the hospital site is somewhat below the level of the nearest municipal sewer and that the building is sewered by means of draining into a concrete sump with a capacity of about 320 gallons from which it is raised to a street sewer, with a maximum lift of nine feet, by means of an automatic bilge pump. There is evidence, however, to the effect that the sump is equipped with an alarm bell which would warn of the presence of water above the level to which it is supposed to be kept by the automatic pump, and is capped with a tight cover so that water under pressure could not escape from it but would overflow the plumbing in the hospital, thereby indicating that the pump was not working properly. There is also evidence to the effect that the equipment is thoroughly modern and adequate to effectively perform the work required of it." The implied finding of the legislative body that under modern conditions and with care and diligence used in the maintenance of the isolation hospital and all of its appurtenances, there will be no danger of the spreading of contagious and infectious diseases ought not, therefore, to be disregarded.

[8] "It is true that there exists a strong prejudice on the part of some people against living in the vicinity of such an institution and as a consequence the value of the land for residential purposes will necessarily be depreciated. But if there be no actual danger of infection, as has been determined by the board of directors of the City, the mere fear of such a danger will not suffice to warrant the issuance of an injunction. (*Dean* v. *Powell Undertaking Co.*, 55 Cal. App. 545 [203 Pac. 1015]; *Cook* v. *City of Fall River*, 239 Mass. 90 [18 A. L. R. 119, 131 N. E. 346].)

"It may be that upon complaint and proof by the plaintiffs that the isolation hospital and its appurtenances are

not being properly maintained and operated, its improper maintenance may be enjoined. But the complaints in the several suits here before us are directed against the isolation hospital merely as such and the question of its improper maintenance is not, therefore, involved in these proceedings."

[9] At this point it may be noted that the findings of the trial court to the effect that the maintenance and operation of the isolation hospital would constitute a nuisance rests upon two classes of evidence; first, upon the evidence of real estate agents and others to the effect that the establishment and maintenance of said hospital upon the chosen site will cause a depreciation in property values of the plaintiffs and others in that vicinity; second, upon the testimony of medical experts that in their opinion there will be danger of the spread of contagious and infectious diseases to residents in the neighborhood thereof such as the danger of infection from insects such as flies, fleas, or mosquitoes; or from animals such as rats or other rodents, cats, dogs, or birds; or from children or feeble-minded people wandering into the hospital or into dangerous proximity thereto; or from escaping patients; or from possible infection of the clothing of nurses, attendants, or from unknown carriers of disease. Concerning this latter class of evidence it is in our opinion entirely speculative and amounts to no more than the conclusion of these opinion witnesses that every hospital in which any infectious disorders are treated, regardless of the perfection of its construction and operation in accordance with the most up-to-date principles, methods, appliances and preventives, constitutes a menace to public health and a nuisance *per se* in its relation to dwellers in the vicinity of its proposed location. We cannot subscribe to such a doctrine since to do so would result in the exclusion of all hospitals treating infectious diseases from cities and other places in the near vicinity of private abode, a conclusion obviously in conflict with the clearest mandates of public policy and the exercise of the police power in relation to public health. [10] In addition it may be noted that the specific reasons given by these expert witnesses for their conclusions, viz., the possible spread of infection through insects, animals, heedless persons or the infected clothing of nurses and others engaged in the operation of

the hospital when coming into contact with the outside world, are reasons which, even if cogent, have no greater significance in their application to those residing in the vicinity of the hospital than they would have to the public at large and hence would not suffice to constitute such special elements of injury as would serve to create a private nuisance for which these plaintiffs would be entitled to relief in this form of action. As to the first above-stated form of proof, viz., evidence of reduced property valuations, such evidence would not of itself, as already above stated, supply sufficient basis for injunctive relief.

[11] "There can be no question but that a municipality has the right to amend its zoning ordinance from time to time as new and changing conditions warrant and require such revision. (*Miller* v. *Board of Public Works*, 195 Cal. 477 [38 A. L. R. 1479, 234 Pac. 381].) To hold otherwise would be to fix cities' development in the mould of the first zoning ordinances enacted. In the instant cases Ordinances No. 2176, fixing the location of the isolation hospital, by express terms repeals all ordinances and parts of ordinances inconsistent therewith. That portion of Ordinance No. 2176 which fixes the location of the isolation hospital in the particular district is necessarily inconsistent with the provisions of that section of the zoning ordinance (sec. 8, subd. 3), which prohibits the erection of hospitals in such district and such section of the zoning ordinance·is thereby repealed by the enactment of Ordinance No. 2176. That section of the zoning ordinance prohibiting the erection of hospitals and sanitariums in the particular district having been repealed, the erection of an isolation hospital may not be enjoined upon the ground that it is in violation of the zoning ordinance.

[12] "The fact that the property in controversy was purchased with part of the proceeds of a bond issue voted for the purpose of acquiring and constructing a waterworks and system to supply water to said City and its inhabitants does not give to the plaintiffs, as taxpayers, the right to restrain the City from using the property in question for any purpose other than water development. The plaintiffs argue that if property be purchased with the proceeds of bonds voted for a particular purpose, the property so purchased would not be available to the City for any other use.

The record shows that the bonds in question were voted 'for the purpose of acquiring and constructing a waterworks and system to supply water to the city,' and that the electors were not called upon to authorize the purchase of the particular property which the City subsequently purchased, but in general terms authorized the incurring of the indebtedness for the purpose of acquiring and constructing a waterworks and system to supply water to said City and its inhabitants. The officers of the City sold the bonds and with the proceeds bought the properties of the Pasadena Land and Water Company which included the property in controversy. By Ordinance No. 2176 the board of directors of the City transferred the particular property in controversy to the health department as a hospital site, at the same time transferring, from the general fund of the City to the waterworks bond fund, the amount of the market value of the land transferred to be used for purposes for which said bond fund might lawfully be expended. The transfer to the bond fund of a sum of money equal to the market value of the land in controversy, which the record shows was found by the board to be useless for the purpose for which it was first purchased, subserved the purpose for which the bonds were voted in the first instance. Inasmuch as the bonds were not voted for the purchase of this particular property, it was well within the general power of the City to control and dispose of it as its legislative body might deem best. (Charter, sec. 3, art. I, Stats. 1901, p. 888.)

"It will not be necessary for us to discuss in detail other contentions incidentally made which are necessarily involved in the main contentions which we have already discussed and disposed of."

The judgment is reversed.

Lawlor, J., Richards, J., Shenk, J., Seawell, J., and Waste, C. J., concurred.